# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **ANITA WALDRON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:11-CV-00340** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Anita Waldron appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for Supplemental Security Income ("SSI").[1] (*See* Docket # 1.)  For the

following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Waldron applied for SSI in April 2005, alleging that she became disabled as of January 1,

2004, which she later amended to September 9, 2004.[2] (Tr. 19, 71-73, 604-05.)  The

Commissioner denied her application initially and upon reconsideration, and Waldron requested

an administrative hearing. (Tr. 64-66, 594-601.)  On April 25, 2008, Administrative Law Judge

("ALJ") John Pope conducted a video hearing at which Waldron (who was represented by

---

[1] All parties have consented to the Magistrate Judge. (Docket # 15); *see* 28 U.S.C. § 636(c).

[2] The ALJ's decision refers only to an application for SSI. (Tr. 9, 19, 32.)  The record, however, also contains an application and denial for Disability Insurance Benefits ("DIB"), and the transcript of the hearing reflects that the case is for claims of both DIB and SSI. (Tr. 64-66, 69, 71-73.)  For purposes of simplicity, the Court will simply refer to the SSI claim in this Opinion.

counsel), her friend, and a vocational expert testified. (Tr. 606-34.)

On August 19, 2008, the ALJ rendered an unfavorable decision to Waldron, concluding that she was not disabled because she could perform a significant number of jobs in the economy despite the limitations caused by her impairments. (Tr. 19-32.)  The Appeals Council denied Waldron's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-6.)

Waldron filed a complaint with this Court on September 28, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.)  In this appeal, she alleges that the ALJ: (1) failed to properly evaluate the opinions of Ms. Ellsworth, her psychiatric nurse, and Ms. Jones, her mental health therapist; and (2) "cherry-picked" the information on the Hoosier Assurance Plan Instrument report completed by Mr. Schlutsmeyer. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 20-23.)

## II.  FACTUAL BACKGROUND[3]

### A.  Background

At the time of the ALJ's decision, Waldron was thirty-one years old, had a high school education, and possessed past relevant work experience as a cashier and kitchen helper. (Tr. 71, 131, 135.)  She alleges disability due to post traumatic stress disorder ("PTSD"), hearing loss, personality disorder, depression, and obesity. (Opening Br. 2.)  Waldron does not challenge the ALJ's findings with respect to her physical impairments; therefore, the Court will focus on the evidence pertaining to her mental limitations.

### B.  Waldron's Testimony at the Hearing

---

[3] In the interest of brevity, this opinion recounts only the portions of the 634-page administrative record necessary to the decision.

At the hearing, Waldron, who was five feet ten inches tall and weighed 401 pounds, testified that she was single and lived with her mother and her niece and nephew. (Tr. 611.) She performs her self care independently and helps with various home chores such as vacuuming, laundry, and dishes; she goes with her mother to grocery shop, to do the laundry, and to church. (Tr. 617, 619, 622.) She rarely goes anywhere alone and is usually with her mother. (Tr. 617, 619.) In a typical day, Waldron rises early to get her niece and nephew ready for school and then waits for her mother to get up to help make breakfast; she watches television until noon. (Tr. 616.) After lunch she helps do the dishes and then watches television the remainder of the afternoon. (Tr. 616.) In the evening, she plays games with her mother, helps prepare dinner, assists her niece and nephew with their homework, and watches more television. (Tr. 616.) Her brother visits every day, and her sisters visit on weekends. (Tr. 621.)

She stated that she last worked in 2004 as a kitchen helper, but that she was terminated because she could not get along with her sister who also worked there. (Tr. 612-13.) She said that she has since looked for work but that no one will hire her because she is "too slow." (Tr. 613.) Waldron said that she has panic attacks when she is around crowds and needs someone "right on top of [her] to tell [her] what to do." (Tr. 613.) She suffers from flashbacks three times a month and panic attacks once or twice a week in connection with being sexually abused as a child. (Tr. 619-20, 623-24.) She attends group therapy every week and individual counseling every other week. (Tr. 620.) She complained of problems with concentration and in getting along with men. (Tr. 622.)

### C. Summary of the Medical Evidence

Waldron received mental health services from Park Center from April 2004 through

August 2008.  In April 2004, she was diagnosed with chronic PTSD and dependent personality disorder; at that time she was somewhat verbal, easily engaged, and working a part-time job. (Tr. 265.)  Her limitations included a reliance on her mother for transportation; it was noted that Waldron would benefit from gaining independence. (Tr. 265.)

In July 2004, Waldron's treatment plan indicated that she was fearful of social encounters, had low self-esteem, and was very isolating. (Tr. 262.)  She had feelings of detachment from others, demonstrated a restricted range of affect, and was hypervigilant. (Tr. 262.)  She also had problems with depression, anxiety, and controlling her reactions to feelings of anger. (Tr. 262.)  A treatment plan review in October indicated that Waldron was becoming more self sufficient and gaining self-confidence in her own abilities, but was still suffering from significant symptoms of anxiety and depression. (Tr. 259.)  She was moving to Fort Wayne and wanted to manage her depression and anxiety so that she could become more self-reliant and return to school. (Tr. 259, 261.)  A review in December 2004 indicated that Waldron was using coping skills effectively and had progressed toward not blaming herself for past abuses. (Tr. 253.)

Also in December 2004, Veronica Philbin, a psychiatric nurse, completed a client assessment, listing a diagnosis of PTSD, dependent personality disorder, and rule out major depression. (Tr. 258.)  She assigned Waldron a current Global Assessment of Functioning ("GAF") score of 50.[4] (Tr. 258.)  Waldron had recently quit her job in food service because she

_____

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few

thought she was going to be fired; she was donating her plasma to pay her rent. (Tr. 256.)

Waldron stated that from ages twelve to sixteen she had been abused by her father. (Tr. 256.)  He

was recently released from prison and had resumed visiting her and her sister. (Tr. 256.)  Her

sister had very little understanding about why Waldron felt stressed by her father's visits, but

Waldron had a male friend who was very supportive of her. (Tr. 256.)  On mental status exam,

Waldron was very slow moving with psychomotor retardation; she was withdrawn and

immature. (Tr. 256.)  She appeared intellectually slow, depressed, and anxious with a very flat

affect; she felt paranoid and hypervigilant. (Tr. 256.)  Her thoughts were coherent and concrete;

she denied suicidal thoughts, but admitted homicidal ideation towards her sister. (Tr. 256.)

In January 2005, Mark Schlutsmeyer, M.A., completed a Hoosier Assurance Plan

Instrument ("HAPI") on Waldron's behalf. (Tr. 248-52.)  He noted that she had difficulty being

in public places, frequent worrying, social isolation, irritability, and tension, and that these

symptoms interfered with her ability to cope with everyday life challenges, sustain supportive

relationships, and maintain employment. (Tr. 248.)  He also wrote that she was unemployed and

"incapable of working due to extreme social anxiety" and that her symptoms were amplified as a

result of living in a home where her sexual abuser visits on a daily basis. (Tr. 249-50.)  Waldron

reported that she often acts on angry impulses by yelling at others and breaking objects. (Tr.

250.)  Mr. Schlutsmeyer concluded that without services Waldron would have moderate

difficulty with interpersonal functioning, accomplishing daily tasks, and adapting to normal

challenges of a daily routine. (Tr. 252.)

In March 2005, a review by Park Center indicated that Waldron was coping with her

---

friends, conflicts with peers or co-workers). *Id.*  And, a GAF score of 61 to 70  reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

anxiety and altering her environment to minimize frequency of anxiety-provoking situations. (Tr. 246.) She was attending group therapy with therapist Michele Jones to process past traumatic events and related anxieties. (Tr. 246.)

In June 2005, Mr. Schlutsmeyer completed a report of psychiatric status, which was countersigned by Scott Lee, Psy.D., indicating a diagnosis of PTSD and dependent personality disorder. (Tr. 237-45.) He assigned Waldron a current GAF of 60 and a highest-past-year GAF of 70. (Tr. 237.) Waldron reported that she had quit her job in September 2004 because she was angry at coworkers, anxious, and experiencing flashbacks about her father; her anger and anxiety increased when she worked the cash register, took directions or received criticism, or interacted with male management. (Tr. 238.) She was particularly anxious around men with whom she was unfamiliar and because her mother had recently become involved again with her father. (Tr. 239.) Her anxiety and anger led to frequent outbursts toward others and isolation, but Mr. Schlutsmeyer indicated that her interactions with him had not been punctuated with this kind of behavior. (Tr. 239, 243.)

Mr. Schlutsmeyer concluded that Waldron's high level of anxiety and stress in social situations, particularly those involving men, may make it difficult for her to function consistently in a work environment where she is exposed to men. (Tr. 243.) He also thought that her flashbacks would interfere with her ability to function consistently in a work setting. (Tr. 243.) He further opined that although she reports getting distracted at times, Waldron is capable of performing simple work routines. (Tr. 243.) She was having a favorable response to weekly therapy, but her symptoms continued to be triggered by negative interactions with her family members and the presence of her father. (Tr. 243.) Mr. Schlutsmeyer assigned Waldron a

"moderate to good" prognosis given that she is able to get out of the presence of her father. (Tr. 243.)

Also in June 2005, Gale Yordy, Ph.D., examined Waldron at the request of the Social Security Administration. (Tr. 197-200.) Dr. Yordy noted that Waldron's symptoms were consistent with PTSD, depression, and a generalized anxiety disorder. (Tr. 197.) Waldron told Dr. Yordy that she functions independently apart from her need for some instructions related to childcare and not knowing how to make change; she generally avoids people because she feels they know of her past sexual abuse and judge her negatively. (Tr. 199.) She spends a great deal of time alone in her room because of her aversion to public places and her distrust of others. (Tr. 197-99.) Dr. Yordy diagnosed chronic PTSD, generalized anxiety disorder, depressive disorder, pronounced discomfort in social circumstances, and paranoid personality disorder, and assigned her a current GAF of 60. (Tr. 200.)

In July 2005, B.R. Horton, Ph.D., a state agency psychologist, reviewed Waldron's record and completed a psychiatric review technique form indicating that Waldron had mild limitations in activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (Tr. 209-22.) He also completed a mental residual functional capacity assessment in which he found that Waldron was moderately limited in the following abilities: carrying out detailed instructions, maintaining attention and concentration for extended periods, working in coordination with or proximity to others without being distracted by them, completing a normal workday and workweek without interruptions from psychologically-based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and responding appropriately to changes in the work setting.

(Tr. 223-24.) Dr. Horton opined that Waldron retained the ability to perform simple, repetitive tasks but probably not in a highly social context. (Tr. 225.) Dr. Horton's opinion was later affirmed by a second state agency psychologist. (Tr. 225.)

In August 2005, Waldron's Park Center treatment plan stated that she continued to experience some mood instability and anxiety, difficulties in interpersonal relationships, social isolation, and flashbacks. (Tr. 232, 236.) In October, her treatment plan indicated that she was making some progress but still experiencing symptoms of anxiety. (Tr. 230.) In February 2006, an annual report listed Waldron's current problems as anxiety, anger, flashbacks, and nightmares; she continued to need treatment for controlling her anger and impulsive outbursts toward others. (Tr. 351-52.) In April 2006, a review reflected that she had made some progress, but still often had anxiety problems. (Tr. 350.) In July 2006, a review indicated that she continued to make progress and that her anxiety symptoms were reducing in frequency. (Tr. 349.)

In August 2006, Ms. Philbin documented that Waldron exhibited slow and withdrawn behavior, a slightly depressed and anxious mood and affect, poverty of thought form and content, guilty thoughts, and immediate memory problems. (Tr. 365-66.) She exhibited similar clinical signs on a mental status exams in October and December. (Tr. 362, 364.) At the end of October, however, a review indicated that Waldron was doing better since she had moved. (Tr. 340.) In February 2007, Ms. Philbin documented that Waldron exhibited immature behavior; irritable insight and judgment; depressed, anxious, and angry mood and affect; poverty and concrete thought form; poverty and guilty thought content; and memory problems. (Tr. 360.)

In April 2007, Ms. Jones completed an extensive update of Waldron's case. (Tr. 331-38.)

8

She noted that Waldron was planning on moving out of her mother's home due to conflict with her family. (Tr. 331.)  Ms. Jones documented that Waldron had anxieties when out in public and that she had difficulty staying on task. (Tr. 331.)  Her symptoms included little or no interest in others, difficulty establishing close relationships, panic attacks, and difficulty with concentration. (Tr. 334.)

In June 2007, Viann Ellsworth, a psychiatric nurse, wrote that Waldron exhibited withdrawn behavior, limited insight and judgment, anxious and blunted mood and affect, and a fearful and helplessness of thought content. (Tr. 356, 358.)  That same month, a treatment plan report indicated that Waldron was actively participating in treatment and showing positive progress. (Tr. 330.)  She was on a housing list but no housing was available at the time. (Tr. 330.)  Waldron reported using coping skills to deal with PTSD such that her symptoms only minimally impacted her function; her symptoms of depression had also decreased. (Tr. 330.)  A treatment plan in September 2007 indicated that Waldron was still not living independently because she had not been approved for housing. (Tr. 326.)  Ms. Jones assessed that Waldron had shown insight and some decrease in symptoms of depression and had "almost no remaining symptoms of past trauma." (Tr. 326.)  In October, Waldron's treatment plan reflected that she continued to focus on symptoms of PTSD, which had improved, and that she was still on the waiting list with the housing authority. (Tr. 322.)

In November 2007, Waldron saw Tara Pelz for counseling, and the mental status exam showed no positive signs of mental illness. (Tr. 591-93.)  Waldron was seen several more times in 2007 for counseling; it was noted that she was depressed at several visits. (Tr. 564-66, 572, 578, 581, 585, 588.)

In January 2008, a mental status exam by Ms. Jones showed withdrawn behavior; depressed mood; blunted affect; poor insight and judgment; helpless, worthless, and hopeless thought content; and recent memory problems. (Tr. 558-59.) Her treatment response was described as "worse." (Tr. 559.) Ms. Ellsworth noted that Waldron was not taking her medications as prescribed and that she had a return of her symptoms; her medications were restarted. (Tr. 560.) The next day Waldron was seen by Ms. Jones, and her mental status exam was normal. (Tr. 555.) She was also seen by another counselor, Katherine Piering, and she also documented that her mental status was normal with a happy mood. (Tr. 551-552.) Waldron was seen three more times by Ms. Jones, and on all three visits she was positive for a depressed mood. (Tr. 534, 545, 548.) She also visited Ms. Piering, who documented that Waldron had a blunt affect but was making good progress. (Tr. 541-44.)

In February 2008, Waldron visited Ms. Jones three times, who indicated that Waldron was positive for depression at these visits. (Tr. 514, 524, 531.) She also saw Ms. Piering twice and Ms. Ellsworth once, who documented clinical findings of withdrawn behavior, depressed mood, blunted affect, poor insight and judgment, and helpless and hopeless thought content. (Tr. 510-11.) Ms. Ellsworth said that Waldron reported isolating herself from others. (Tr. 511.)

Also in February 2008, Ms. Ellsworth completed a mental impairment questionnaire on Waldron's behalf, listing diagnoses of PTSD, mood disorder, and dependent personality disorder. (Tr. 382-84.) She indicated that Waldron had "regressed with a return of depression [and] anxiety because she stopped taking her medications." (Tr. 383.) Waldron's symptoms included mood disturbance, social isolation, flat affect, panic attacks, intrusive recollections of traumatic experience, paranoia, pathological dependence, and difficulty concentrating. (Tr. 382.)

Ms. Ellsworth indicated that Waldron had progressed through psychotherapy but still had significant symptoms. (Tr. 383.)  She opined that if Waldron returned to work, the stress of working would increase her panic attacks and her fears of being around other people. (Tr. 384.) This anxiety would interfere with her ability to concentrate on tasks and she would not be able to function at an expected rate. (Tr. 384.)

Ms. Ellsworth also completed a medical source statement in which she opined that Waldron had "no useful ability to function" in the following areas: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain attendance, and be punctual; sustain an ordinary routine without special supervision; work with or near others without being distracted by them; complete a normal workday or workweek; and perform at a consistent pace. (Tr. 385.)  She found that Waldron would require a great deal of time and supervision to carry out instructions, that she would be unable to concentrate well enough to carry out detailed instructions, and that the pace at which she would be able to work would not meet industry standards due to her difficulty staying on task. (Tr. 385-85A.)  She further opined that Waldron would have "no useful ability to function" in interacting with the public, accepting instructions and responding appropriately to criticism from supervisors and changes in the work setting, getting along with co-workers and peers, and traveling in unfamiliar places or use of public transportation. (Tr. 386.)

Also in February 2008, Ms. Jones penned a letter stating that Waldron struggles with angry outbursts when criticized by others and that her insight was poor. (Tr. 380-81.)  Ms. Jones thought that Waldron would be frightened to work without her mother and that she would have

difficulty understanding directions from more than one person. (Tr. 381.)  She wrote that Waldron had a history of verbally and physically assaulting others when acting out in anger. (Tr. 381.)

In March, Ms. Jones saw Waldron four times; she was positive for depression at three visits and positive for anxiety at the remaining visit. (Tr. 488, 497, 504, 507.)  She also saw Ms. Piering in March, who noted that Waldron was drowsy. (Tr. 493.)  In April, Waldron was again positive for depression at four of five visits with Ms. Jones (Tr. 449, 463, 470, 474, 484), and she was described as anxious but happy at one of her two visits with Ms. Piering. (Tr. 455, 577.)  A treatment plan review that month indicated that she needed to work on boundaries, was cooperative in treatment, and had been attempting to increase her social relationships although she was still frightened of men. (Tr. 461.)

In May 2008, Ms. Ellsworth indicated that Waldron's treatment response was stable and the only positive finding was poor insight and judgment. (Tr. 446-47.)  She was seen twice by Ms. Jones that month and was positive for depression at one visit and neutral at the other. (Tr. 437, 443.)  Waldron saw Ms. Jones four times in June and was positive for depression at three visits and neutral at the other. (Tr. 424, 428, 431, 434.)  In July, Waldron was positive for depression at all four visits with Ms. Jones. (Tr. 409, 412, 415, 418.)  Ms. Ellsworth documented in July that Waldron exhibited withdrawn behavior, depressed mood, blunted affect, and helpless and hopeless thought content; her treatment response, however, was improved. (Tr. 403-04.)  Waldron told Ms. Ellsworth that her medications were helping, but that she still felt depressed and isolated at times. (Tr. 404.)  In August, Waldron was positive for depression at two of her four visits with Ms. Jones. (Tr. 389, 392, 296, 399.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.*  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

### IV.  ANALYSIS

#### A.  The Law

Under the Act, a plaintiff is entitled to SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

In determining whether Waldron is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

### B. The ALJ's Decision

On August 19, 2008, the ALJ rendered his opinion. (Tr. 19-32.) He found at step one of the five-step analysis that Waldron had not engaged in substantial gainful activity since her application date, and at step two, that her PTSD, hearing loss, personality disorder, dysthymic disorder, and obesity were severe impairments. (Tr. 21.) At step three, he determined that Waldron's impairment or combination of impairments did not meet or equal a listing. (Tr. 22.)

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 416.920(e), 416.945. The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 416.920(e), 416.945(a)(5).

Before proceeding to step four, the ALJ found Waldron's subjective complaints not credible to the extent they were inconsistent with the following RFC:

> [T]he claimant has the residual functional capacity to perform light work . . . except that she must avoid even moderate exposure to noise and hazards, and she must avoid concentrated exposure to vibrations. The claimant is limited to jobs which can be performed with limited hearing and to jobs requiring simple, repetitive tasks without strict time or production requirements. The claimant can engage in only occasional contact with the public, co-workers, and supervisors.

(Tr. 23-24.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Waldron was unable to perform any of her past relevant work. (Tr. 30.) The ALJ then concluded at step five that Waldron could perform a significant number of other jobs within the economy, including cleaner/maid, laundry folder, and vending machine attendant. (Tr. 31.) Therefore, Waldron's claim for SSI was denied. (Tr. 31-32.)

### C. The ALJ's Consideration of the Opinions of Ms. Ellsworth and Ms. Jones Is Supported by Substantial Evidence

Waldron argues that the ALJ's decision to discount the opinions of Ms. Ellsworth, her psychiatric nurse, and Ms. Jones, her mental health therapist, are not supported by substantial evidence. At bottom, Waldron's appeal of the Commissioner's final decision equates to a plea to this Court to reweigh the evidence with the hope that it will come out in her favor this time. Of course, a plea to the Court to reweigh evidence is ultimately not fruitful. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (explaining that the court is not allowed to substitute its judgment for the ALJ by "reweighing evidence").

To begin, the determination of a claimant's RFC is an issue reserved to the Commissioner. 20 C.F.R. § 416.927(e); *see* SSR 96-5p. With respect to her mental limitations,

the ALJ assigned Waldron an RFC that limited her to jobs "requiring simple, repetitive tasks without strict time or production requirements . . . [and] only occasional contact with the public, co-workers, and supervisors." (Tr. 23-24.) The ALJ pointed out that this RFC was consistent with the report of psychiatric status penned by Mr. Schlutsmeyer and countersigned by Dr. Lee, which indicated that Waldron was capable of performing "simple work routines" and assigned her a current GAF of 60, indicating moderate symptoms, and a highest-past-year GAF of 70, indicating mild symptoms, (Tr. 237, 243); the opinion of Dr. Yordy, who also assigned Waldron a GAF of 60 (Tr. 200); and the review by Dr. Kladder, who stated that Waldron could perform simple, repetitive tasks but probably not in a highly social context (Tr. 225).

In assigning greater weight to the opinions of Dr. Lee, Dr. Yordy, and Dr. Kladder, the ALJ assigned less weight to the more restrictive opinions of Ms. Ellsworth and Ms. Jones. (Tr 28-30.) To review, Ms. Ellsworth opined that Waldron had "no useful ability to function" in thirteen of twenty-two work-related mental abilities and that her anxiety, concentration difficulties, slow pace, social anxiety, anger issues, and panic attacks prevent competitive employment. (Tr. 385-87.) Similarly, Ms. Jones thought that the stress of working would increase Waldron's panic attacks and social anxiety, which would then interfere with her ability to concentrate and function at an expected rate. (Tr. 380-81.) Both Ms. Ellsworth, a nurse, and Ms. Jones, a therapist, are considered "other sources" under Social Security Ruling 06-03P.

Opinions from "other sources" should be evaluated using the applicable factors set forth in 20 C.F.R. § 416.927 for weighing medical opinions from "acceptable medical sources." SSR 06-03p, 2006 WL 2329939. "Not every factor for weighing opinion evidence will apply in every case." *Id.* The evaluation of an opinion from an "other source" "depends on the particular facts

in each case." *Id.* Therefore, "[e]ach case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." *Id.*

Here, the ALJ discounted the opinions of Ms. Ellsworth and Ms. Jones for several reasons, including that Waldron had regressed only after she discontinued her medication, that she had progressed to the point where she had "almost no remaining symptoms of past trauma," that most of her personal conflicts were directed at family members, and that she was pursuing independent housing which undercut her claim of disabling dependency. (Tr. 29.) Waldron challenges these reasons, asserting that the ALJ's decision to assign greater weight to the opinions of the "acceptable medical sources"—Dr. Lee, Dr. Yordy, and Dr. Kladder—than the more restrictive opinions of Ms. Ellsworth and Ms. Jones, is not supported by substantial evidence. Waldron's challenges to the ALJ's reasoning, however, come up short.

First, the ALJ discounted Ms. Ellsworth's and Ms. Jones's restrictive February 2008 opinions because he detected that Waldron had regressed at about that same time after discontinuing her medications—a point Ms. Ellsworth specifically acknowledged in her opinion. (Tr. 29 (citing Tr. 383 ("[C]lient has regressed with a return of depression, anxiety because she stopped taking her medications.")).) He astutely contrasted these February 2008 opinions with Ms. Ellsworth's documentation in September 2007 indicating that Waldron had shown improved insight, a decrease in depressive symptoms, and had "almost no remaining symptoms of past trauma." (Tr. 29 (citing Tr. 326).)

Waldron concedes that the ALJ is correct in observing that she regressed only after discontinuing her medications. (Resp. Br. 6.) She argues, however, that the treatment records

indicate that even when taking her medications, she was still positive for depression at many of her visits with Ms. Ellsworth and Ms. Jones, reflecting her continued significant problems with depression. (Resp. Br. 6-7.)  But just because Ms. Ellsworth's and Ms. Jones's treatment notes reflect that Waldron was "positive for a depressed mood" when taking her medications does not establish that she was disabled; the diagnosis of an impairment does not alone establish the severity of the impairments and its limitations. *See Estok v. Apfel*, 152 F.3d 636, 639 (7th Cir. 1998).  "The issue . . . is not the existence of these various conditions of hers but their severity and, concretely, whether . . . they have caused her such severe pain that she cannot work full time." *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004).  Here, the ALJ's decision to discount Ms. Ellsworth's and Ms. Jones's restrictive February 2008 opinions, which were completed about the same time that Waldron had discontinued her medication and regressed, is reasonable and supported by substantial evidence.

Next, Waldron contends that the ALJ erred by failing to consider Ms. Ellsworth's and Ms. Jones's opinions that the stress of returning to work would exacerbate her anxiety problems. (Opening Br. 21.)  But the ALJ *did* indeed consider their views on this point, as he expressly mentioned Ms. Jones's concern that Waldron "would be frightened in a work setting without her mother," that "she would have difficulty understanding directions given by more than one person," and that she "would likely respond to criticism with angry outbursts." (Tr. 29.)  He nevertheless concluded that their concerns, to the extent they were supported by the record, were adequately accommodated by the RFC he assigned for simple, repetitive tasks without strict time or production requirements and only occasional contact with others. (Tr. 29.)  Thus, Waldron's argument that the ALJ ignored this evidence is more accurately characterized as a plea to assign

18

more weight to her nurse's and therapist's opinion on this point, which the Court cannot do. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (emphasizing that the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner").

The ALJ also discounted Ms. Ellsworth's and Ms. Jones's representations of Waldron's disabling dependency for the reason that she was pursuing independent housing. (Tr. 29.) Waldron argues that although she indeed was taking steps to live independently, she did not accomplish that during the relevant period and thus it was "more of a goal th[a]n an indication what her capabilities were at the time." (Opening Br. 22.) But this assertion too is meritless because, as the ALJ observed, the reason Waldron did not live independently during the relevant period was *not* because of her functional limitations, but rather because she was still on the waiting list for public housing assistance. (*See* Tr. 28; *see, e.g.*, Tr. 322.)

Next, Waldron nitpicks the ALJ's comment that most of her personal conflicts were related to family members, which he made when considering her reported difficulty with crowds, tendency to withdraw, and history of interpersonal conflicts. (Tr. 28.) She argues that the record evidences that she isolated herself, was fearful of social encounters, and had past outbursts with coworkers. (Opening Br. 22.) But Waldron's attempt to refute the ALJ's observation by pointing to evidence that *some* of her conflicts involved non-family does not undercut the ALJ's accurate observation that *most* of her personal conflicts were triggered by family members. As the ALJ noted, throughout the medical evaluations Waldron was noted to be "pleasant and cooperative" (Tr. 29), and, of course, one of the "coworkers" with which she conflicted was her sister (Tr. 24, 612-13); *see generally Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when

reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it").

In addition, Waldron criticizes the ALJ for failing to mention a GAF of 50 assigned by Ms. Philbin, asserting that "under case law it is legal error to not discuss the GAF." (Opening Br. 5 (citing *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010)). When assigning this GAF in December 2004, Ms. Philbin documented that Waldron's psychosocial stressors were "extreme" in that she was living with "a family member who allows her perpetrator to visit every other weekend." (Tr. 258.) Although the ALJ did not specifically mention the GAF score, he did cite to Ms. Philbin's records, agreeing that the presence of Waldron's abuser in her home "understandably caused [her] increased anxiety in addition to conflicts and outbursts." (Tr. 26 (citing Tr. 229-67).) Because the ALJ discussed the narrative findings contained in Ms. Philbin's records, his failure to specifically mention the GAF score assigned by her does not serve as a basis for a remand. *See Warner v. Astrue*, No. 1:11-cv-267, 2012 WL 3044244, at *6 n.5 (N.D. Ind. July 25, 2012) (collecting cases).

And finally, Waldron argues that the ALJ erred by failing to consider and evaluate the "checklist" factors set forth in 20 C.F.R. § 416.927 when weighing Ms. Ellsworth's and Ms. Jones's opinions. *See* SSR 06-03P. But Waldron's argument is again misplaced, as the ALJ *did* expressly acnowledge that Waldron had consistently received her mental health care at Park Center since 2004 (Tr. 26, 29), had attended group therapy on a weekly basis and individual counseling every other week (Tr. 25), and that Ms. Ellsworth was a psychiatric nurse and Ms. Jones a mental health therapist (Tr. 28-29). Therefore, the ALJ adequately considered the length of the treatment relationship and frequency of examination, the nature and extent of the treatment

relationship, and Ms. Ellsworth's and Ms. Jones's respective specializations in accordance with 20 C.F.R. § 416.927(c). No more can be expected of the ALJ.

In short, it is the responsibility of the ALJ, rather than this Court, to resolve conflicts in the medical evidence, and here the ALJ adequately did so. *See Young*, 362 F.3d at 1001. The Court will not accept Waldron's invitation to reweigh the opinions of Ms. Ellsworth and Ms. Jones. *See id.* ("[The Court's] task is limited to determining whether the ALJ's factual findings are supported by substantial evidence."); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000) ("[W]e cannot reweigh the evidence or substitute our own judgment for that of the ALJ.").

### D. The ALJ Fairly Considered the Opinion of Mr. Schlutsmeyer

Not to be deterred, Waldron tacks on a cursory, one-paragraph argument that the ALJ inappropriately "cherry-picked" the opinion of Mr. Schlutsmeyer, an "other source" who administered the HAPI and completed a report of psychiatric status that was countersigned by Dr. Lee. (Opening Br. 23; Reply Br. 6-7.) She asserts that although the ALJ expressly discussed Mr. Schlutsmeyer's statement in his June 2005 report of psychiatric status that she could perform "simple work routines" (Tr. 243), the ALJ erred by failing to mention Mr. Schlutsmeyer's comment in the HAPI report six months earlier that she was "incapable of working due to extreme social anxiety" (Tr. 249).

But an ALJ "need not discuss every piece of evidence in the record . . . ." *Dixon*, 270 F.3d at 1175. Rather, an ALJ must "sufficiently articulate his assessment of the evidence to assure us that [he] considered the important evidence . . . [and to enable] us to trace the path of [his] reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). "If the ALJ were to ignore an entire line of evidence, that would fall below the minimal level of articulation

required." *Id.* Here, the ALJ expressly acknowledged that he indeed considered the HAPI report completed by Mr. Schlutsmeyer, commenting that it "reflects a subjective measure of the claimant's status." (Tr. 26.) Of course, a medical opinion may be discounted if it is based solely on a patient's subjective complaints. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). Moreover, the ALJ further observed that Waldron had no more than moderate difficulties or symptoms in any area of functioning listed on the report and that her symptoms were amplified at that time because her abuser was visiting her home on a daily basis. (Tr. 26.) Thus, the ALJ adequately articulated why he discounted the information on the HAPI report, which included Mr. Schlutsmeyer's statement that she was "incapable of working." As a result, Waldron's final argument is unavailing.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Waldron.

SO ORDERED.

Enter for this 12th day of October, 2012.

S/Roger B. Cosbey_____
Roger B. Cosbey,
United States Magistrate Judge